1 | Felicia Medina (SBN 255804)
fmedina@medinaorthwein.com
2 | Jennifer Orthwein (SBN 255196)
jorthwein@medinaorthwein.com
3 | Kevin Love Hubbard (SBN 290759)
khubbard@medinaorthwein.com
4 | MEDINA ORTHWEIN LLP
5 | 1322 Webster Street, Suite 200
Oakland, CA 94612
6 | Telephone: (510) 823-2040
Facsimile: (510) 217-3580
7 |

8 | *Attorneys for Plaintiff Lori Jespersen*

9 |
**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**
10 |

11 |

12 | LORI JESPERSEN,                          | **Case No.: 2:18-CV-00246-JAM-CKD**

13 |              **Plaintiff,**

14 |         v.                               | **AMENDED COMPLAINT FOR DAMAGES, PENALTIES, AND INJUNCTIVE RELIEF**

15 | CALIFORNIA DEPARTMENT OF CORRECTIONS
16 | AND REHABILITATION; ROBERT FOX; JOAN     | **Superior Court of California, County of Solano, Case No. FCS050123**
GERBASI; TIA MCDANIEL; and DOES 1-50,
17 | INCLUSIVE,

18 |              **Defendants**.

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

AMENDED COMPLAINT

Plaintiff Dr. Lori Jespersen ("Plaintiff" or "Dr. Jespersen"), by and through her attorneys, Medina Orthwein LLP, brings this action against the California Department of Corrections and Rehabilitation ("CDCR") and where applicable, Robert Fox, Joan Gerbasi, Tia McDaniel, and Does 1-50, inclusive, (all together, "Defendants") for violations of California anti-discrimination, anti-harassment, and anti-retaliation laws.  Defendants have retaliated against Dr. Jespersen and endangered her personal safety because she filed complaints regarding unlawful human rights violations concerning transgender and gay prisoners and for taking protected medical leave.  Dr. Jespersen alleges upon knowledge concerning her own acts and upon information and belief as to all other matters.[1]

## I.    **INTRODUCTION**

1.    CDCR is the second largest corrections system in the United States.  It provides health care services to approximately 129,000 prisoners in 35 prisons and 43 conservation camps throughout the State of California and oversees over 9,000 medical care positions.

2.    Human rights abuses are rampant in California prisons, particularly for Lesbian, Gay, Bisexual, Transgender, and Queer ("LGBTQ") people.

3.    CDCR is well aware transgender people are disproportionately the targets of sexual and physical assault, and are at heightened risk for gender dysphoria, a severe psychiatric condition that causes anxiety and depression, and increases their risk for self-harm and suicide.  This is particularly true in CDCR prisons, where transgender prisoners are almost always housed and treated inconsistently with their gender identity, therefore compounding trauma and the symptoms of gender dysphoria.

4.    Yet CDCR continues to foster an atmosphere that is hostile toward members of the LGBTQ community and an environment that encourages and condones abuse.  CDCR's homophobic and transphobic environment stems from the violent, discriminatory, harassing, and derogatory behavior of CDCR's leadership, policies and practices, staff, and prisoners, whose egregious behavior CDCR knowingly ratifies.

5.    As detailed further below, CDCR and its employees have actively degraded and dehumanized its LGBTQ community by jeopardizing their privacy and safety, verbally assaulting and

---

[1] Plaintiff obtained Defendants' written consent to amend her pleading pursuant to Federal Rule of Civil Procedure 15(a)(2) on February 7, 2018.

endangering gay and transgender prisoner-patients, and interacting with LGBTQ prisoner-patients and employees in blatantly discriminatory and hostile ways.

6.    All such inhumane treatment and actions are prohibited by law: chiefly, the United States Constitution, as well as the Prison Rape Elimination Act, 34 U.S.C. § 30301 *et seq.* ("PREA"); the Health Insurance Portability and Accountability Act, 42 U.S. Code § 1320d *et seq.* ("HIPAA"); the Patient Protection and Affordable Care Act, 42 U.S.C. § 18001 *et seq.* ("ACA"); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.*, as amended ("Title VII"); and the California Fair Employment and Housing Act, Cal. Govt. Code section 12940 *et seq.* ("FEHA").

7.    To remedy these conditions and to improve the overall quality of CDCR's health care, Dr. Jespersen, a genderqueer (a/k/a gender non-conforming) lesbian Clinical Psychologist at the California Medical Facility in Vacaville, has actively brought these violations to the attention of CDCR leadership.

8.    Since July 2014, Dr. Jespersen has filed several complaints about the mistreatment of LGBTQ prisoners at CDCR's California Medical Facility in Vacaville, California, and the manner in which she has been harassed and discriminated against because of her own protected classifications, as well as her association with and advocacy on behalf of protected groups.

9.    Despite Dr. Jespersen's efforts, CDCR has failed to remedy its mistreatment of LGBTQ prisoners and employees in the California Medical Facility.

10.    Upon information and belief, CDCR did not conduct formal investigations into most of Dr. Jespersen's complaints and reports, or discipline the individuals responsible for the harassment or abuse of LGBTQ prisoners.

11.    Instead, Defendants CDCR, Fox, Gerbasi, and McDaniel retaliated against Dr. Jespersen. The shocking nature of Defendants' retaliation against Dr. Jespersen—***trapping her unsupervised by custody in units with notoriously dangerous prisoners, soliciting prisoners to harm her, and more***—forced Dr. Jespersen to take medical leave from June 1, 2016 through June 28, 2016.

12.    Adding insult to injury, when Dr. Jespersen returned from protected medical leave, Defendants CDCR, Fox, and Gerbasi, further retaliated against her by relegating her to a secretarial role wherein she could not clinically treat patients, wherein her safety remained in danger, and where she was no longer in a position to report prisoner mistreatment, harassment, and abuses.  Furthermore, Defendant

AMENDED COMPLAINT                                                                                      2

McDaniel continues to assign herself to the units where Dr. Jespersen has been transferred, thereby continuing to retaliate against her by stalking and intimidating her. Defendants CDCR and Fox also continue to retaliate against Dr. Jespersen by refusing to separate Defendant McDaniel from Dr. Jespersen. Notably, the State Personnel Board recently sustained Dr. Jespersen's California Whistleblower Protection Act claim of retaliation as to CDCR for failing to separate her from Defendant McDaniel.

13.     Dr. Jespersen brings claims under the FEHA; the California Family Rights Act, Cal. Govt. Code Sections 12945.1 and 12945.2 *et seq.* ("CFRA"); California Labor Code Section 1102.5, *et seq.*; and the California Whistleblower Protection Act, Cal. Govt. Code Section 8547.8(c).

## II.     THE PARTIES

14.     **Plaintiff Dr. Lori Jespersen** is a current CDCR employee who, at all times relevant to this action, lived and worked in the State of California. In March 2008, Dr. Jespersen joined CDCR as a Clinical Psychologist/Clinical Case Manager in the California State Prison in Sacramento, California. In 2009, she transferred to the California Medical Facility in Vacaville, California.

15.     **Defendant CDCR** is a public entity that receives both state and federal funding. CDCR's principal place of business is in California, with headquarters in Sacramento, California.

16.     **Defendant Robert Fox** ("Fox") is or was the Warden of California Medical Facility ("CMF"). Upon information and belief, Defendant Fox is a resident of California. As Warden, Defendant Fox has ultimate and direct authority over CMF, including the administration and execution of policies and procedures and ensuring compliance with state and federal laws governing employees and prisoners. Warden Fox also has supervisory authority over Defendant Tia McDaniel. Specifically, he has the ultimate authority to discipline, terminate, investigate, and transfer correctional staff as the "Hiring Authority." Defendant Fox is sued here in his individual capacity for damages based on actions, inaction, or conduct taken or performed under the color of state law.

17.     **Defendant Joan Gerbasi** ("Gerbasi") is or was the Chief of Psychiatry, Acting Chief Executive Officer ("CEO") of CMF, and Dr. Jespersen's direct supervisor. Upon information and belief, Defendant Gerbasi is a resident of California. Defendant Gerbasi had direct supervisory responsibilities over Dr. Jespersen during relevant times and, as Acting CEO of CMF and Chief of Psychiatry, she had the authority over operations at CMF related to mental health employees and prisoners, including the

administration and execution of policies and procedures and ensuring compliance with state and federal laws governing employees and prisoners.  Defendant Gerbasi is sued here in her individual capacity for damages based on actions, inaction, or conduct taken or performed under the color of state law.

18.   **Defendant Tia McDaniel** ("McDaniel") is a Correctional Officer at CMF.   Upon information and belief, Defendant McDaniel is a resident of California.   As a Correctional Officer, Defendant McDaniel is responsible for protecting the safety of prisoners and employees and is subject to the policies and procedures related to prisoners and employees.  Defendant McDaniel is sued here in her individual capacity for damages based on actions, inaction, or conduct taken or performed under the color of state law.

19.   Dr. Jespersen is ignorant of the true names and capacities of Defendants sued herein as Does 1 through 50, inclusive and therefore sues these Defendants by such fictitious names.  Dr. Jespersen will amend this complaint to allege true names and capacities when ascertained.  Dr. Jespersen is informed and believes and thereupon alleges that each of the fictitious and named Defendants is responsible in some manner for the occurrences here alleged, and that Dr. Jespersen's injuries as she herein alleges were proximally caused by the acts and omissions of these Defendants.  For convenience, each reference to any of the named Defendants herein shall also refer to Does 1 through 50, inclusive.

20.   Dr. Jespersen is informed and believes and thereon alleges that Defendants, and each of them, were and are the agents, employees, partners, joint ventures, co-conspirators, owners, principals and/or employers of the remaining Defendants, and at all times herein mentioned were and are acting within the course and scope of such agency, employment, partnership, conspiracy, ownership and/or joint venture. Dr. Jespersen is further informed and believes and based thereon alleges that the acts and conduct herein alleged of each such Defendant were known to, authorized by, and/or ratified by the other Defendants, and each of them.  Each of the individuals named as Defendants are sued in their individual capacity for damages based on actions, inaction, or conduct taken or performed under the color of state law, and was, at all times relevant to this lawsuit, employed by the State of California or CDCR, and was obligated to take all steps necessary to ensure that the respective agency's mission was carried out in accordance with all applicable laws and regulations.

### III.   JURISDICTION

21.     Dr. Jespersen duly filed a charge of employment discrimination before the California Department of Fair Employment and Housing ("DFEH") and the U.S. Equal Employment Opportunity Commission ("EEOC") on May 27, 2015.  On October 1, 2015, Dr. Jespersen attended a failed mediation facilitated by the DFEH.

22.     On August 15, 2016, Dr. Jespersen amended her DFEH complaint.

23.     On November 30, 2016, Dr. Jespersen filed an amended Charge of Discrimination before the EEOC and a second amended DFEH complaint.

24.     On January 19, 2017, the DFEH issued Dr. Jespersen a right to sue letter corresponding to her second amended DFEH complaint.

25.     On April 21, 2017, Dr. Jespersen attended a failed mediation facilitated by the EEOC.

26.     On June 28, 2017, Dr. Jespersen filed a written whistleblower retaliation complaint with the California State Personnel Board ("SPB"), alleging the retaliatory acts described in more detail below.

27.     On August 2, 2017, Dr. Jespersen filed an amended written whistleblower retaliation complaint against Defendants CDCR, Fox, Gerbasi, McDaniel, and another CDCR employee with the SPB, re-alleging the retaliatory acts described in more detail below.

28.     On August 14, 2017, Dr. Jespersen filed a Complaint for Damages, Penalties, and Injunctive Relief in the United States District Court for the Eastern District of California, Case No. 2:17-CV-01689-KLM-DB (the "Federal Matter").

29.     On August 17, 2017, the SPB responded to Dr. Jespersen's amended whistleblower retaliation complaint, commencing an investigation of Dr. Jespersen's complaint.  The SPB assigned the matter to an informal hearing before an SPB Hearing Officer as to Defendants CDCR, Gerbasi, and McDaniel, and dismissed the complaint as to Defendant Fox.  The SPB therefore issued findings pursuant to California Government Code Section 19683 as to Defendant Fox with its August 17, 2017 letter.

30.     On August 28, 2017, the United States Department of Justice, Civil Rights Division, issued Dr. Jespersen a notice of her right to sue under Title VII regarding her EEOC charge.

31.     On September 7, 2017, Dr. Jespersen filed a First Amended Complaint in the Federal Matter.

---

AMENDED COMPLAINT                                                                                      5

32.    On October 24, 2017, the SPB Hearing Officer held an informal hearing regarding Dr. Jespersen's amended whistleblower retaliation complaint against Defendants CDCR, Gerbasi, and McDaniel.

33.    On January 4, 2018, Dr. Jespersen voluntarily dismissed the Federal Matter without prejudice pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i) and 28 U.S.C. § 1367(d).

34.    The SPB issued findings regarding Dr. Jespersen's amended whistleblower retaliation complaint against Defendants CDCR, Gerbasi, and McDaniel pursuant to California Government Code Section 19683 on February 7, 2018, finding that Defendant CDCR had engaged in retaliatory acts against Dr. Jespersen.

## IV.    FACTUAL ALLEGATIONS

35.    In March 2008, Dr. Jespersen began her employment with CDCR as a Clinical Psychologist, Correctional Facility at the California State Prison in Sacramento, California.  In February 2009, Dr. Jespersen transferred to the California Medical Facility, a CDCR facility in Vacaville, California.  Since this transition, Dr. Jespersen has continued to serve as a Clinical Psychologist, Correctional Facility at CMF.

36.    Prior to joining CDCR, Dr. Jespersen received her Bachelor of Arts, *Phi Eta Sigma*, in Legal Studies and Philosophy from the University of California, Santa Cruz and her Masters and Doctorate in Clinical Psychology from the American School of Professional Psychology, graduating at the top of her class.

37.    At CDCR, Dr. Jespersen dedicated herself to her job and distinguished herself as a top performer, providing quality and humane mental health services to her prisoner-patients.  Throughout her employment at CDCR, Dr. Jespersen has consistently received performance ratings of either "above average" or "exceeds expectations."  Dr. Jespersen also served as a Supervising Psychologist for Anka Behavioral Health's CASA Rohnert Park facility from 2010 to 2013 and Olympia House from 2013 to 2016.

38.    In addition to being a practicing psychologist, Dr. Jespersen has also taught and published in her field.  Dr. Jespersen served as an adjunct faculty member at The Wright Institute in 2009.  In 2010, Dr. Jespersen published a book on current psychological research regarding the benefits of wellness titled

*From This Day On*.

39.     Dr. Jespersen identifies as genderqueer and lesbian.  She is married to a woman.  Dr. Jespersen tends to wear masculine clothing while at work, and overall does not conform to feminine stereotypes of appearance or behavior.

40.     As detailed herein, despite Dr. Jespersen's performance, CDCR has discriminated and retaliated against her because of her gender, sexual orientation, association with the LGBTQ community, and complaints of discrimination and harassment against gender non-conforming and LGBTQ prisoners.

## A.     CDCR Fosters an Environment That Is Hostile Toward the LGBTQ Community

41.     Lesbian, gay, and bisexual incarcerated people experience sexual abuse by staff at twice the rate of other incarcerated people, and sexual abuse by another incarcerated person at 10 times the rate of other groups.[2]

42.     Transgender prisoners are raped and subjected to coercive sex at alarmingly high rates as well.  A full 59% of transgender prisoners in California reported being sexually assaulted while in custody, compared to 4.4% of non-transgender prisoners.[3]

43.     Transgender people are subjected to "rape and sexual exploitation," which are "overlooked or even encouraged by guards, who provide access and impunity as a means of controlling social hierarchies and maintaining order."[4]

44.     In addition to sexual violence, transgender prisoners are often subjected to verbal and

---

[2] Allen J. Beck et al., Bureau of Justice Statistics, Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12 (2013), *available at* http://www.bjs.gov/content/pub/pdf/svpjri1112.pdf.  Transgender women housed in men's prisons are most at risk, reporting sexual assault at 13 times the rate of male inmates.

[3] Valerie Jenness, *Transgender Inmates in California's Prisons: An Empirical Study of a Vulnerable Population* 14 (2009), *available at* http://ucicorrections.seweb.uci.edu/files/2013/06/Transgender-Inmates-in-CAs-Prisons-An-Empirical-Study-of-a-Vulnerable-Population.pdf.

[4] Julia C. Oparah, *Feminism and the (Trans)gender Entrapment of Gender Nonconforming Prisoners*, 18 UCLA Women's L.J. 239, 262 (2012), *available at* http://escholarship.org/uc/item/3sp664r9#page-1 ("Alexis Giraldo, a transgender woman, experienced 'horrific sexual abuse' at the hands of her cellmates in Folsom State Prison.  At the request of a prisoner employed as a lieutenant's clerk, she was assigned as his cellmate.  He immediately began to harass, rape, and threaten her on a daily basis.  Despite asking to be moved to another cell, she was kept in the same cell.  Another prisoner, a friend of her rapist, was also moved to the cell at his request. This second cellmate also began to rape her daily.").

---

physical abuse at the hands of officers or other incarcerated people.  In a 2011 study performed by the National Center for Transgender Equality and the National Gay & Lesbian Taskforce, 18% of transgender women who had experienced incarceration reported physical assault while 9% experienced physical assault by guards.[5]  In the same study, 40% of transgender women respondents reported harassment from other incarcerated people and 38% reported being harassed by correctional officers or staff.[6]

45.     Based on the above research, in 2012, the Federal Department of Justice ("DOJ") issued mandatory standards ("PREA Standards") to address prisoner rape and assault for vulnerable populations.

46.     The DOJ identified LGBTQ prisoners as a highly vulnerable population and adopted specific mandatory standards for the treatment and prevention of rape and sexual assault against LGBTQ prisoners.

47.     In 2014, California Governor Jerry Brown submitted an assurance to the DOJ that CDCR would continue its work on developing and implementing policy to ensure compliance with national standards.  CDCR has yet to propose PREA-compliant amendments to Title 15 of the California Code of Regulations and CDCR's Department Operations Manual ("DOM") to adequately protect LGBTQ incarcerated people.

48.     In June 2015, CDCR began training its medical and mental health staff on the new requirements of PREA, specifically some of the requirements related to LGBTQ prisoners.

49.     Despite the new requirements under the PREA Standards, CDCR employees still frequently make homophobic and transphobic comments expressing their bias against members of the LGBTQ community, which includes CDCR employees like Dr. Jespersen.

50.     For example, in December 2015, and again in March 2016, on occasions when Dr. Jespersen wore markedly feminine bohemian style apparel, rather than her usual black jeans and flannel shirt, Defendant McDaniel commented on her appearance, suggesting that Dr. Jespersen should dress in feminine clothing more often.

51.     Similarly, on May 26, 2016, Defendant McDaniel and Officer Lamont Jones made hateful,

---

[5] Jaime M. Grant et al, National Center for Transgender Equality & National Gay and Lesbian Task Force, *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey* 166 (2011), *available at* http://www.thetaskforce.org/downloads/reports/ reports/ntds_full.pdf.

[6] *Id.*

transphobic statements, including, "Transgenders attract flies—you don't want 'em on your unit."

52.   In another example, on or about July 21, 2014, CDCR employees Jessica Spencer, Chris Biagi, and Anthony Ornelas posted messages on Facebook that "outed" a transgender patient, whom Dr. Jespersen was treating, using the patient's name, her status and location as a mental health patient, and other identifying and private information.  They referred to the patient using derogatory terms such as "he/she" and "that thing," and stated, "[h]e [*sic*] would probably lick your ass if u wanted."

53.   Defendant Gerbasi also demonstrated hostility toward the LGBTQ community.   For example, after Dr. Jespersen and another psychologist, who identifies as gay, reported the hostile social media post in December 2014 to Defendant Gerbasi, Defendant Gerbasi responded dismissively that "this is only important to you because it's your community," referring to the LGBTQ community.  Defendant Gerbasi's comments reflected her hostility toward Dr. Jespersen and the other employee because of their gender expression and sexual orientation, in addition to their advocacy on behalf of LGBTQ prisoners. The other CDCR employee, who reported the hostile post with Dr. Jespersen during this meeting, was taken aback by Defendant Gerbasi's callous response.   At the time, Defendant Gerbasi was Chief of Psychiatry and Dr. Jespersen's direct supervisor.

54.   Defendant Gerbasi also discussed Dr. Jespersen's relationship with another woman, and therefore disclosed Dr. Jespersen's sexuality, with other CDCR employees shortly after Dr. Jespersen's complaints about the hostile social media posts.  At the time, Defendant Gerbasi was promoted to Chief of Mental Health.  Upon information and belief, Defendant Gerbasi has disclosed and gossiped about Dr. Jespersen's same-sex relationship to at least three Clinical Psychologists since early 2015.

55.   Officers and other CDCR employees regularly refuse to use gender-appropriate pronouns for transgender individuals, instead insisting on referring to transgender prisoners by their birth-assigned sex, despite the obvious negative impact such harassment has on a transgender individual's mental health and sense of safety.  Efforts by Dr. Jespersen and others to remedy this type of harassment have only fueled further discrimination and harassment.

56.   For instance, upon information and belief, during a training on May 5, 2015, several CDCR employees sighed and rolled their eyes when told to use neutral or respectful pronouns to refer to transgender prisoners.  The officer leading the training replied with words to the effect of, "I know, I know

you don't like it, but you want to get paid, don't you?"

57.     On another occasion, on or around July 1, 2015, CDCR employees working in the Custody Department pointedly used the pronoun "he" to refer to a transgender woman in response to a social worker who had told them that they should be calling transgender women "she." According to these CDCR employees, the social worker's point was "irrelevant." A complaint was made and Defendant Fox was notified, but he failed to act to end the deliberate misgendering of the transgender prisoner.

58.     Officers and other CDCR employees also regularly use derogatory and hostile terms when speaking about and/or to LGBTQ prisoners and employees. For instance, on multiple occasions, Defendant McDaniel referred to LGBTQ prisoners as "faggots."

59.     On or about August 21, 2016, Dr. Jespersen had a meeting in the Warden's office with Defendant Fox and some other high level administrative officials regarding the arrival of a new transgender patient. In that meeting, custody staff referred to the person in custody as "shim," a derogatory term for a transgender person. This is just one example of many when Dr. Jespersen has been subjected to the use of derogatory terms freely used by staff at all levels to refer to members of her community.

60.     CDCR employees have forced female transgender prisoners to show their breasts and buttocks to receive their undergarments. When Dr. Jespersen reported this harassment on August 7, 2015, Correctional Counselor Yuvette Glee, one of the employees harassing transgender prisoners, responded to Dr. Jespersen: "from what I can tell, he ain't got enough tits to show," and "after what he did, he don't get to be a woman."

61.     Upon information and belief, CDCR employees have assisted prisoners in beating and otherwise abusing gay and transgender prisoners on the basis of their sexual orientation and perceived gender nonconformity.

62.     Upon information and belief, transgender prisoners have been denied privacy screens without legitimate reason, while being unnecessarily forced to strip down to receive their undergarments.

63.     Guards also impede gay, transgender, and gender non-conforming prisoners from accessing mental health treatment. On one occasion, on June 16, 2016, Defendant McDaniel prevented prisoners from attending a support group because they were transgender. The leader of this group heard Defendant McDaniel shout, "You're no woman, you have a dick, your breasts can't give milk and you

will never have a man" and "I don't agree with your lifestyle and I never will, and this is a men's prison, you are not 'she.'"  Then Defendant McDaniel approached the support group leader and threatened words to the effect of, "Are you intending to write me up? Because we need to have each other's backs up in here. . ."  A complaint was filed by the group leader, who does not identify as LGBTQ, and an adverse employment action was finally lodged against Defendant McDaniel by Defendant Fox.   Defendant McDaniel was removed from her post and disciplined.

64.     Based on information and belief, Defendant McDaniel was never removed from a post in response to Dr. Jespersen's prior or subsequent complaints regarding Defendant McDaniel's treatment of LGBTQ prisoners or employees.

65.     On another occasion, on November 30, 2015, the CDCR identification cards belonging to a group of transgender patients were stolen and thrown down an elevator shaft while the patients were attending a transgender support group put on by CDCR mental health staff.  The identification cards were in the possession of custody staff during the therapy group.

66.     In another example, in March 2017, Defendant McDaniel began to allow prisoners to socialize outside of the room where an LGBTQ group therapy session was held, even after the mental health facilitator explained the group's safety concerns regarding their LGBTQ identities.  When the group leader asked Defendant McDaniel to respect the therapy group and their safety concerns, Defendant McDaniel replied, "I don't know if that will happen."  The group therapy leader reported these incidents to several CDCR employees, who took no action in response.

67.     In mid-October 2017, a mental health practitioner who, among other duties, ran one of the LGBTQ therapy groups at CMF, was violently assaulted while working in an office on a unit where Defendant McDaniel had previously been assigned.  The correctional officer on duty did not see the incident occur; however, members of another LGBTQ group did and intervened to rescue the practitioner.  This incident illustrates the serious consequences that can occur when custody staff leaves mental health staff unattended, as well as the dangers that exist for LGBTQ prisoners, staff, and allies in an institution that is hostile toward the LGBTQ community.

68.     On December 20, 2017, Dr. Jespersen, along with other CDCR employees, attended a mandatory PREA training at CMF led by a CDCR Investigative Services Unit officer.  During the training,

the training officer called the desire of transgender inmates to be referred to by their preferred pronoun "silly" and told the class not to call these inmates "he/she" and to "avoid the headache" by referring to transgender prisoners as "inmate" or by their last name rather than their preferred pronouns.  Furthermore, the training officer refused to read the slides containing definitions related to LGBTQ people out loud, although he read every other slide out loud during the training.  LGBTQ prisoners were discussed in the training because they face higher risk of violence; however, the training officer also made clear to emphasize his belief "some transgenders in there think they're special – they're not."

### B.   Dr. Jespersen Protested Defendants' Discrimination and Harassment Against the LGBTQ Community

69.    Dr. Jespersen has made dozens of complaints—including several explicit written and verbal complaints—about the ongoing hostility toward gay and transgender prisoners and the harassment and hostile work environment she has experienced on various administrative levels at CDCR because of her gender—including her sex, sexual orientation, and gender expression—and because of her advocacy on behalf of the LGBTQ prison population.

70.    Despite responding promptly to complaints concerning other types of issues, CDCR has failed to correct the conditions Dr. Jespersen identified in these complaints and has discouraged her from making them.

71.    Dr. Jespersen's complaints include, but are not limited to:

a.      On or about July 21, 2014, Dr. Jespersen complained about Jessica Spencer, Chris Biagi, and Anthony Ornelas's discriminatory and hostile social media posts to her Unit Supervisor.  Upon information and belief, a written report was provided to CDCR leadership members, including CEO Jackie Clark, Chief of Mental Health David Silbaugh, Chief of Psychiatry Joan Gerbasi, Investigative Services Unit Lieutenant Anthony Lee, and Associate Warden Dan Cueva.  On December 19, 2014, Dr. Jespersen was informed of CDCR's decision to dismiss the complaint as a rumor.  On December 22, 2014, Dr. Jespersen learned from the Investigative Services Unit that no one was interviewed despite the witness list and contact information provided with the complaint.  Furthermore, Lt. Lee, who was charged with investigating the incident, was promoted to Captain and a position at CDCR Headquarters shortly after failing to investigate their reports.  According to the DFEH, CDCR disclosed to the DFEH that it did not

discipline any employees in relation to Ms. Spencer, Mr. Biagi, and Mr. Ornelas's social media post, claiming that CDCR had no responsibility to do so because the incident took place outside of the workplace. However, the Department Operations Manual ("DOM") specifies that the sexual harassment policy "applies to conduct that occurs off duty and is brought back to the workplace, when such conduct adversely affects the individual in a manner otherwise prohibited by this policy." Furthermore, the employees breached the patient's federal HIPAA rights; therefore, the location of where the breach occurred is irrelevant regarding these violations as well.

b.      On December 30, 2014, Dr. Jespersen reported experiencing sexual harassment based on her status as a gender non-conforming lesbian woman and a member of the LGBTQ community. Specifically, Dr. Jespersen's complaint reported the hostile work environment created by Jessica Spencer, Chris Biagi, and Anthony Ornelas's social media post and CDCR's callous apathy in responding to it. Dr. Jespersen made this complaint to the Custody Department and Steve Pryor, the EEO employee she was directed to under the EEO policy. No one interviewed her and no one generated a written complaint, in violation of CDCR policy.

c.      On or around May 29, 2015, Dr. Jespersen reported to Defendant Gerbasi that Dr. Debbie McKinney had been discriminating against and harassing her on the basis of her sexual orientation, including outing Dr. Jespersen in the workplace. Dr. Jespersen requested a different assignment because she had become uncomfortable with people knowing about her relationship and commenting about it. At that time, Defendant Gerbasi refused her request.

d.      On December 2, 2015, Dr. Jespersen reported to Defendant Gerbasi that a correctional officer was forcing a transgender prisoner to strip search to retrieve her property and subsequently denied her a privacy screen. Defendant Gerbasi escalated the PREA violation to Defendant Fox. Dr. Jespersen was never interviewed regarding this report and, based on information and belief, no investigation into the PREA violation ever occurred.

e.      On March 8, 2016, Dr. Jespersen submitted a PREA report to the Watch Commander about an incident wherein a gay prisoner of color ("Prisoner 1") had been assaulted and battered by another prisoner ("Prisoner 2"), who had a history of harassing LGBTQ prisoners. Dr. Jespersen performed a psychological evaluation and risk assessment on Prisoner 1. Prisoner 1 reported to

both Dr. Jespersen and another psychologist that Prisoner 2 and CDCR officers were harassing him and sought assistance from the Investigative Services Unit ("ISU") in ending the harassment. Within 48 hours of Prisoner 1's request for help from the ISU, a CDCR employee left the shower door open while Prisoner 1 was showering, which allowed Prisoner 2 to assault and batter Prisoner 1. As CDCR employees typically lock these shower doors, the CDCR employee(s)'s decision to not lock the shower door constituted assistance in the physical assault of a man based on his sexual orientation.

f. The Watch Commander refused to accept Dr. Jespersen's March 2016 PREA report, instructing Dr. Jespersen to direct the report to the L-2 Unit Lieutenant, which does not exist. Dr. Jespersen then brought her report to the J-2 Unit Lieutenant who assured her that he would alert the ISU about the incident. When Dr. Jespersen followed up with ISU, they told her they had never received the report. In light of this, Dr. Jespersen submitted an additional complaint about the CDCR's leadership's efforts to block her complaint of discrimination and harassment, as well as CDCR's failure to take action. Upon information and belief, CDCR never investigated or addressed the officers' failure to lock the shower door, nor did it respond to Dr. Jespersen's concerns about CDCR's complaint management.

g. On March 16, 2016, Dr. Jespersen submitted a PREA report on behalf of a transgender patient to the Watch Commander after the patient was told she could not file a complaint about a CDCR officer who had been deliberately, and with the intention of belittling her, using male pronouns to refer to her, even after she asked him to stop. Dr. Jespersen was following the reporting protocol and guidelines related to staff sexual harassment of prisoners on which she was trained in June 2015. To Dr. Jespersen's knowledge, CDCR took no action.

h. On May 26, 2016, Dr. Jespersen reported the May 26, 2016 comment of, "Transgenders attract flies—you don't want 'em on your unit" to Supervisor Joe Dintino. Dr. Jespersen also reported the comment to EEO Coordinator Brian Olson on June 8, 2016.

j. On that same day, Dr. Jespersen verbally complained to Defendant Gerbasi and expressed concerns for her safety. In response, Defendant Gerbasi then made it clear that she did not take Dr. Jespersen's complaints seriously, stating, "Don't get paranoid."

C. **Defendants Discriminated and Retaliated Against Dr. Jespersen Due to Her Gender and Sexual Orientation, Association with and Advocacy on Behalf of the LGBTQ Community, and for Complaining About Unlawful Harassment**

72.     In response to the countless complaints Dr. Jespersen raised on behalf of herself and other members of the LGBTQ community at CDCR, and because of Dr. Jespersen's gender, gender expression, sexual orientation, and her association with and advocacy on behalf of gender nonconforming, gay, and transgender prisoners, CDCR subjected Dr. Jespersen to escalating discrimination, harassment, and retaliation.

73.     In or around October 2015, after Dr. Jespersen took medical leave when her wife was injured in an accident, Dr. McKinney raised unfounded and biased concerns about nepotism between Dr. Jespersen and her wife to Defendant Gerbasi.  Approximately six months prior to this, Dr. Jespersen reported Dr. McKinney's discrimination and harassment to Defendant Gerbasi and was denied a new assignment.  In response to Dr. McKinney's biased complaint, Defendant Gerbasi transferred Dr. Jespersen from the Crisis Bed Unit to a Correctional Clinical Case Management System unit on the mainline of the main prison facility, where Defendant McDaniel was stationed.  This transfer occurred after 13+ months of complaints surrounding the Facebook incident and CDCR's failure to respond to the complaints, Dr. Jespersen's May 27, 2015 Complaint of Discrimination with the DFEH, and the failed October 1, 2015 mediation facilitated by the DFEH.

74.     As part of its retaliatory campaign, CDCR enabled Defendant McDaniel—a frequent discriminator and harasser of gender nonconforming, gay, and transgender prisoners and employees, who Dr. Jespersen reported on several occasions—to target Dr. Jespersen.

75.     Specifically, Defendant McDaniel began soliciting prisoners to attack Dr. Jespersen.  Such incidents include, but are not limited to:

a.     On December 14, 2015—two weeks after Dr. Jespersen reported a correctional officer's refusal to provide a privacy screen to a transgender prisoner—Defendant McDaniel endangered Dr. Jespersen's life by leaving her alone and unsupervised, without access to a safety alarm, with a prisoner who is serving multiple life sentences for rape.  Later that day, Defendant McDaniel left her station for the day without ensuring all prisoners were cleared from the unit, leaving Dr. Jespersen on a locked unit with another prisoner unsupervised and without access to an alarm.  Both acts are serious violations of protocol.  The next day, Dr. Jespersen reported Defendant McDaniel's actions to Supervisor Joseph Dintino and the Watch Commander on duty.  On information and belief, no one acted to meaningfully

respond to Dr. Jespersen's report of the life-threatening situation in which Defendant McDaniel put Dr. Jespersen.

       b.      On March 17, 2016 – the day after one of Dr. Jespersen's complaints on behalf of a transgender prisoner—Defendant McDaniel again left Dr. Jespersen on a locked unit with no supervision from custody and no safety alarm—this time with two prisoners.  Dr. Jespersen again reported Defendant McDaniel's actions to Supervisor Joseph Dintino.  Again, no one acted to meaningfully respond to Dr. Jespersen's report.

       c.      On or around April 7, 2016, as Dr. Jespersen walked by Defendant McDaniel, Defendant McDaniel commented to a group of prisoners regarding her, "fat ass—I hate that motherfucking bitch."  In prison, such a statement is intended, and is readily interpreted, as a solicitation of violence.  Dr. Jespersen reported the incident to the Watch Commander.[6]

       d.      On or around April 28, 2016, Defendant McDaniel said of Dr. Jespersen to a group of prisoners, "she is rent to own. . . she's gotta stop putting my name out there.  That's rent to own."  "Rent to own" is a phrase used to incite sexual violence and imply female promiscuity.  Dr. Jespersen reported this incident to Supervisor Joseph Dintino and consulted with her Union Representative.

76.     These solicitations of violence were particularly frightening and legitimate due to Defendant McDaniel's relationship with the prisoners.  Defendant McDaniel has the discretion to punish and reward prisoners, including by expanding or restricting their privileges; therefore, Defendant McDaniel's solicitations of harm toward Dr. Jespersen put her in significant danger, given the incentives for prisoners to follow through with a request from a custody officer.

77.     The threats to Dr. Jespersen's safety continued and escalated.  Specifically, on May 24, 2016, Dr. Jespersen overheard Defendant McDaniel solicit physical harm against Dr. Jespersen by stating to a group of prisoners, "She needs to be reminded where she's at."  Later in the day, when another doctor confronted Defendant McDaniel about his concern that the crowd of prisoners around Defendant McDaniel was unsafe, Defendant McDaniel said, "that's that Jespersen shit," meaning that it was Dr.

---

[6] Defendant Fox, as Warden and the Hiring Authority, had the ability to initiate an "adverse employment action" against Defendant McDaniel and chose not to do so after these incidents targeting Dr. Jespersen were escalated to his attention on April 21, 2016.  As a result, no disciplinary action had been taken against Defendant McDaniel and she was allowed to continue to intimidate and harass Dr. Jespersen.

1 Jespersen who had made complaints related to safety issues created by Defendant McDaniel.  Defendant

2 McDaniel made these comments in the presence of prisoners.  Later in the day, also in the presences of

3 prisoners, Defendant McDaniel went around the unit loudly asking other doctors whether they felt safe,

4 underscoring that she held Dr. Jespersen responsible for the complaints regarding safety.  Dr. Jespersen

5 reported the incident to her supervisor, Joe Dintino, and the Watch Commander.  The incident was

6 escalated to Defendant Gerbasi and Defendant Fox.  Again, based on information and belief, no action

7 was taken to address the incidents.

8          78.     On May 31, 2016, Dr. Jespersen consulted her Union Representative, Dr. Victor Pacheco,

9 regarding her safety concerns.  Dr. Pacheco confirmed that the fact that Defendant McDaniel had singled

10 out Dr. Jespersen's name to prisoners, while suggesting Dr. Jespersen be "reminded where she's at,"

11 created a significant safety risk.

12          79.     After each of these solicitations of violence, Dr. Jespersen submitted complaints to

13 Defendant McDaniel's Supervisor, Thomas Huntley, and the Watch Commander.  Nothing was done to

14 remedy the safety concerns Dr. Jespersen raised.  For months following Dr. Jespersen's initial complaints

15 of this harassment, CDCR did not follow up.

16          80.     Instead, CDCR knowingly allowed Defendant McDaniel to escalate her retaliatory

17 harassment.  Upon information and belief, CDCR's knowing failure to act allowed Defendant McDaniel

18 to continue endangering Dr. Jespersen's life because of her complaints, her gender, her sexual orientation,

19 and her association with gender nonconforming, gay, and transgender prisoners.

20          81.     On June 8, 2016, Dr. Jespersen complained to EEO Coordinator Brian Olson about

21 Defendant McDaniel.  Dr. Jespersen specified that she felt that Defendant McDaniel was retaliating and

22 discriminating against her based on her gender, her sexual orientation, and for engaging in protected

23 activities.

24          82.     Despite Dr. Jespersen's repeated complaints, CDCR and Defendant Fox allowed

25 Defendant McDaniel to continue her unabashed discrimination, harassment, and retaliation.  On one

26 occasion, Defendant McDaniel exclaimed loudly, in Dr. Jespersen's presence, "I am the motherfucking

27 police, I got folks on the outside too."

28          83.     Upon information and belief, Defendant McDaniel has also used her power to incentivize

prisoner complaints against Dr. Jespersen.  In October 2017, Dr. Jespersen learned that Defendant McDaniel had directly solicited a prisoner to submit a false report about Dr. Jespersen.  The prisoner responded to clarify whether Defendant McDaniel wanted him to lie and Defendant McDaniel answered, "Yes."  The prisoner refused to submit the false report and subsequently reported the incident to one of his treatment providers.  Based on information and belief, Defendant McDaniel solicited another prisoner to file a false report as well, but that prisoner also refused.

84.     On October 24, 2017, the California State Personnel Board held a hearing regarding Dr. Jespersen's related whistleblower claims at which Dr. Jespersen, Defendant Gerbasi, and Defendant McDaniel all testified, and the written testimony of several other CDCR employees was reviewed.  One of the CDCR employees who presented written testimony on behalf of Dr. Jespersen later learned that prisoners had been discussing her participation in the State Personnel Board hearing after learning about her participation from Defendant McDaniel.

85.     According to Defendant Gerbasi, she, Mr. Dintino, and another Psychologist met with Defendant Fox, Warden at CMF, several times to discuss Defendant McDaniel's behavior.  As a result, Defendants Fox and Gerbasi were all well aware of Dr. Jespersen's complaints regarding Defendant McDaniel's harassment.  Nevertheless, they did not act to prevent it.

**D.     Defendants Interfered with Dr. Jespersen's Protected Medical Leave and then Demoted Her**

86.     Because CDCR refused to end the harassment, to discipline Defendant McDaniel, or to address Dr. Jespersen's safety concerns, Dr. Jespersen was and had been experiencing emotional, mental, and physical distress.  In light of those medical concerns, Dr. Jespersen's doctor put her on a medical leave of absence.

87.     Dr. Jespersen then provided a standard medical notice from her doctor to CDCR and a return to work coordinator.  Dr. Jespersen started her medical leave on June 1, 2016.  The medical leave was initially set to continue through mid-July 2016, when Dr. Jespersen was scheduled to be reassessed by her doctor to determine whether she was ready to return to work.[7]

---

[7] In the spring of 2016, Dr. Jespersen requested to take a leave during a portion of the summer of 2016. Defendant Gerbasi's callous response was to ask Dr. Jespersen, "Why don't you just quit?"

88.     In late June 2016, Defendant Gerbasi contacted Dr. Jespersen to pressure her to return early from her medical leave so she could attend an important meeting.  Dr. Jespersen expressed concern for her safety in the prison and Defendant Gerbasi told her she would be stationed on a different unit off the mainline, but only if she returned three weeks early.  Based on this conversation, Dr. Jespersen understood this to be a temporary placement while CDCR completed the investigation into her complaints regarding Defendant McDaniel.

89.     On June 28, 2016, Dr. Jespersen returned to CMF.  Following Dr. Jespersen's return from medical leave, rather than addressing Defendant McDaniel's unlawful conduct, CDCR furthered its ongoing retaliation by removing Dr. Jespersen from direct patient care and eliminating her oversight responsibilities for patient care.  Dr. Jespersen's new job duties were largely secretarial in nature, involving tasks such as answering emails and phone calls, and collecting copies of medical and mental health records.

90.     Dr. Jespersen's position was void of nearly all the managerial and clinical duties required of positions with the same or similar titles in other CDCR facilities.  Furthermore, the unique secretarial duties specifically required of Dr. Jespersen in the Higher Level of Care ("HLOC") position at CMF served to completely isolate her from other clinical line and managerial staff.  Her assignment in HLOC also effectively prevented Dr. Jespersen from continuing to witness and report prisoner harassment and abuse.

91.     These conditions adversely affected the material terms of Dr. Jespersen's job duties.  The decision to demote Dr. Jespersen was presented as a temporary solution for Defendant McDaniel's harassment while Dr. Jespersen's complaints were being investigated and addressed, and instead became a de facto demotion.  Dr. Jespersen's temporary removal from direct patient care and oversight of patient care became CDCR's permanent "solution" to Defendant McDaniel's harassment.

92.     Upon information and belief, when Dr. Jespersen's change in position came up during a meeting among team leaders, Defendant Gerbasi informed the team that the reason Dr. Jespersen was transferred was simply because she was not getting along with Defendant McDaniel due to personality differences.

93.     Dr. Jespersen's demoted role required her to perform tasks that are typically done by

individuals with far less academic qualifications and experience, such as nurse technicians and office technicians.  She was the only position in the clinical workforce, not including Specialists and Supervisors who are above her, that had no patient contact at all.  Dr. Jespersen also was not able to facilitate mental health groups, provide individual therapy, or conduct assessments.

94.   On July 6, 2016, Dr. Jespersen filed a new report about Defendant McDaniel's behavior with Defendant McDaniel's supervisor, Captain Thomas Huntley.  The report stated that Defendant McDaniel had identified herself as homophobic and transphobic and had been targeting Dr. Jespersen for months because of her gender, sexual orientation, and identification with the LGBTQ community.

95.   Less than a week after Dr. Jespersen's July 6, 2016 report, CDCR allowed Defendant McDaniel to assign herself to Dr. Jespersen's new work location off the mainline of the prison.  Upon information and belief, Defendant McDaniel chose this placement despite having never worked in this area before.  Dr. Jespersen complained to CDCR about the dangerous and hostile work environment Defendant McDaniel's reassignment perpetuated.  However, Defendant McDaniel continued to work at Dr. Jespersen's new location on and off until February 2017.

96.   In approximately February 2017, Defendant McDaniel was assigned to a unit that is considered the hub of mental health treatment, where most mental health care treatment team meetings for CDCR patients at CMF take place.  Upon information and belief, Defendant McDaniel sought this placement to intimidate Dr. Jespersen.

97.   At some point in late 2017, Defendant McDaniel was assigned to an escort role, meaning that she can escort prisoners to all parts of the CMF facility and has unfettered access to Dr. Jespersen.  The unpredictable nature Defendant McDaniel's access to Dr. Jespersen in this role created additional anxiety and stress, as Dr. Jespersen could never be sure when her safety would be jeopardized.

98.   On November 3, 2017, Dr. Jespersen raised additional concerns for her safety and about Defendant McDaniel's harassment with CDCR's Chief Psychologist, and asked to be separated from Defendant McDaniel in light of those concerns.  In response, CDCR informed Dr. Jespersen that it would not separate employees for "personal differences," trivializing Dr. Jespersen's well-founded concerns for her physical safety in light of Defendant McDaniel's ongoing retaliation.  Dr. Jespersen also complained about her demoted role on several occasions.

99.     Dr. Jespersen remained in this HLOC workstation and job position in the unfulfilled hope of being separated from Defendant McDaniel until February 2018, when the position was changed to one requiring a Psychologist Specialist.  At that time, and only after Dr. Jespersen left the role, the duties of the position were re-aligned to those consistent with the same position at other facilities by CDCR Headquarters.  Dr. Jespersen was offered a different position, where she is once again working directly with prisoner patients.

100.     Dr. Jespersen went from a practicing Clinical Psychologist with a caseload of nearly 200 patients, to a role that provided zero patient contact for over a year and a half because CDCR and Warden Fox refused to separate Defendant McDaniel from Dr. Jespersen.

101.     The demoted role also jeopardized Dr. Jespersen's status as a licensed psychologist and, therefore, her career.  With no patient contact, and no duties that allowed her to exercise clinical skills to treat patients, Dr. Jespersen's scope of practice was restrained significantly.  Furthermore, she was forced to quit her job with Olympia House because she was no longer eligible to supervise students or unlicensed psychologists because she was no longer actively treating patients.  CDCR made no effort to address Dr. Jespersen's safety concerns so she could return to her prior position or one comparable to it.

102.     Dr. Jespersen remains in fear for her safety in her new position as Defendant McDaniel continues to assign herself or is assigned to posts in the vicinity of Dr. Jespersen's new office.

103.     In fact, within a week of being served the Complaint filed in State Court, Defendant McDaniel was posted in the crisis beds, where Dr. Jespersen was still assigned.  Defendant McDaniel then remained there for several weeks, again jeopardizing Dr. Jespersen's safety.

104.     In January 2018, after multiple requests to be separated from Defendant McDaniel, Dr. Jespersen was offered a position located back inside the institution assessing developmentally disabled prisoners, which she accepted.

105.     Dr. Jespersen began the new position in February 2018.  However, the threat of danger to Dr. Jespersen's physical safety from Defendant McDaniel and prisoners whom McDaniel incited to commit violence against Dr. Jespersen continued.

106.     Indeed, within a week of arriving in her new position, on February 7, 2018, Defendant McDaniel appeared approximately 30 feet down the hall from Dr. Jespersen's new location.  Defendant

McDaniel stared Dr. Jespersen down as she proceeded down the shared corridor to her office.

**E.    Defendants Retaliated Against Dr. Jespersen For Whistleblowing about HIPAA and PREA Violations**

107.    In addition to protesting discrimination and harassment, Dr. Jespersen blew the whistle on CDCR's violations of the HIPAA and the PREA and its implementing regulations, 28 CFR Part 115, National Standards to Prevent, Detect and Respond to Prison Rape Final Rule, as detailed below.

108.    Indeed, the California State Personnel Board issued findings regarding Dr. Jespersen's California Whistleblower Protection Act claims on February 7, 2018, and found that Dr. Jespersen "made numerous protected disclosures throughout the time period relevant to this matter."  In those findings, the SPB concluded that Dr. Jespersen's "reports that [Defendant] McDaniel was purposefully endangering [Dr. Jespersen's] well being" and Dr. Jespersen's complaints that Defendant "McDaniel's conduct constituted retaliation for [Dr. Jespersen's] initial reports" were all protected disclosures.

i.    Dr. Jespersen Protested CDCR's Violation of a Transgender Prisoner's HIPAA Rights

109.    When Dr. Jespersen reported Jessica Spencer, Chris Biagi, and Anthony Ornelas's social media post on or around July 21, 2014, Dr. Jespersen also informed CDCR that the post breached HIPAA laws by identifying a prisoner's name, diagnosis, and placement in a unit run by the Department of State Hospitals.  As detailed above, after the complaint was submitted to various members of CDCR's leadership, CDCR decided to take no action purportedly because the event occurred outside of the workplace.

110.    On or around December 23, 2014, the Department of Health and Human Services instructed Dr. Jespersen to disclose the social media post to her patient pursuant to HIPAA.  In or around March 2015, Chief of Psychiatry Joan Gerbasi prohibited Dr. Jespersen from doing so, claiming that CDCR remained undecided if a HIPAA violation had occurred.  On or around May 6, 2015, Dr. Jespersen again expressed concern to Defendant Gerbasi about CDCR's failure to inform her patient about its employees' breach of HIPAA.  When Dr. Jespersen stated that she felt obligated to inform CDCR's headquarters, Defendant Gerbasi instructed her not to, explaining that it should be reported by Dr. Silbaugh.  On September 9, 2015, CDCR informed Dr. Jespersen that its investigation concluded that

Jessica Spencer, Chris Biagi, and Anthony Ornelas's social media post did constitute a HIPAA security breach.

111.     On May 27, 2015, Dr. Jespersen filed an Information Security Incident Report to California Correctional Health Care Services ("CCHCS") regarding the HIPAA violation.

112.     The SPB specifically concluded that Dr. Jespersen's reports regarding the HIPAA violation also constituted protected disclosures.

ii.     Dr. Jespersen Protested CDCR's PREA Violations

113.     As detailed above in Sections IV.B and IV.C, Dr. Jespersen has reported dozens of PREA violations and has filed several PREA reports about CDCR's discrimination and harassment.

114.     The SPB also concluded that Dr. Jespersen's "December 2015 and March 2016 reports regarding potential PREA violations also constituted protected disclosures."

iii.     Defendants CDCR, Fox, Gerbasi, and McDaniel Retaliated Against Dr. Jespersen for those Protected Disclosures

115.     As detailed above, Defendant McDaniel retaliated against Dr. Jespersen by harassing her, endangering her physical safety, soliciting prisoners to submit false reports about Dr. Jespersen, and openly mocking Dr. Jespersen's safety concerns in front of prisoners.

116.     Defendant CDCR and Defendant Fox retaliated against Dr. Jespersen by providing Defendant McDaniel access to Dr. Jespersen so she could continue her campaign of harassment, intimidation, and retaliation, and by failing to respond adequately to Dr. Jespersen's pleas that they remedy the situation.

117.     Indeed, the SPB found that Defendant CDCR retaliated against Dr. Jespersen under the California Whistleblower Protection Act because of its "failure to ensure" that Defendant McDaniel did not have access to Dr. Jespersen following Dr. Jespersen's return from medical leave.  Specifically, the SPB concluded that "CDCR knew, or should have known, that having McDaniel responsible for the security of the [unit to which Dr. Jespersen was transferred] shortly after [Dr. Jespersen's] transfer there, was reasonably likely to impair [Dr. Jespersen's] job performance."

118.     Defendants CDCR and Fox were responsible for the failure to ensure that Defendant McDaniel did not have access to Dr. Jespersen.  The SPB concluded that Dr. Jespersen "reported serious

potential misconduct by [Defendant] McDaniel in April and May 2016," and that "CDCR took a nonchalant approach to [Dr. Jespersen's] reports, telling [Dr. Jespersen's] supervisors that their hands were tied unless formal discipline occurred."

119.    Defendant Fox, as the Hiring Authority, was ultimately responsible for CDCR's failure to reassign Defendant McDaniel when he failed to initiate discipline against McDaniel in response to Dr. Jespersen's multiple complaints.  Dr. Jespersen's complaints regarding Defendant McDaniel's serious misconduct were repeatedly raised to CDCR and Defendant Fox, and CDCR and Defendant Fox nevertheless allowed Defendant McDaniel to perpetuate the dangerous and hostile work environment for Dr. Jespersen.

120.    Since the SPB hearing in October 2017, Defendants CDCR and Fox have continued the pattern of allowing Defendant McDaniel to follow Dr. Jespersen and be posted near her following her protected activities.  For example, after Dr. Jespersen's November 2017 complaint regarding Defendant McDaniel talking to another CDCR employee in Dr. Jespersen's work area in the crises beds for nearly an hour *after* she escorted and dropped off a prisoner to this location, CDCR informed Dr. Jespersen that it would not separate Defendant McDaniel for "personal differences."  Defendants therefore continued the pattern of allowing Defendant McDaniel to follow Dr. Jespersen to new assignments after Dr. Jespersen's protected activities.

121.    CDCR and Defendant Fox's retaliatory behavior continues to this day.  In early February 2018, Dr. Jespersen took a new role in a different wing of CMF, in part in an effort to further separate herself from Defendant McDaniel.  Yet, on February 7, 2018, after Dr. Jespersen had been in the new wing for only six days, Defendant McDaniel appeared within 30 feet of Dr. Jespersen's new office.  Even in Dr. Jespersen's new position, then, Defendants CDCR and Fox have allowed Defendant McDaniel to follow and intimidate Dr. Jespersen in retaliation for her protected activity.

122.    Defendant Gerbasi retaliated against Dr. Jespersen for her complaints of discrimination and harassment based on her sexual orientation and gender expression and identity by dismissively handling Dr. Jespersen's reports of LGBTQ patient abuse and placing her in a position that isolated her from other staff.  Because of this isolation, Dr. Jespersen was unable to file reports of patient abuse or provide direct clinical care within the scope of her licensure, education, and training.

123.     Defendant Gerbasi characterized Dr. Jespersen's position as one that is "highly sought after" at the SPB hearing, yet failed to explain the secretarial duties and the lack of managerial and clinical responsibilities unique to the position she helped craft for Dr. Jespersen at CMF.  These duties are drastically different from the job duties associated with the same position at other CDCR facilities.

124.     Defendant Gerbasi also only offered to address Dr. Jespersen's safety concerns by transferring her to a location away from where Defendant McDaniel was posted if she returned early from medical leave.

125.     Moreover, Defendant Gerbasi did not offer Dr. Jespersen a comparable position to the one she was assigned prior to taking medical leave.  Based on information and belief, Defendant Gerbasi was directly responsible for creating Dr. Jespersen's unique HLOC position, which amounted to a constructive demotion and caused Dr. Jespersen to be completely isolated from patient care and other clinical and managerial staff.

**F.     Defendants Have Damaged Dr. Jespersen's Physical, Mental, and Emotional Well-Being**

126.     Prior to the first incident involving the HIPAA breach and subsequent retaliation, Dr. Jespersen was happy with her job.  Now, she lives in constant fear of violence and harassment at work.

127.     As a result of the discrimination and harassment, Dr. Jespersen has experienced emotional and physical distress.  She has developed numerous symptoms related to anxiety, depression and trauma. She has become hypervigilant, concerned someone will be able to trace her car at work and will find out where she lives.  Most nights, she does not sleep more than three hours, as she often lays awake ruminating about work, and wakes up from nightmares and anxiety.  Her relationships outside of work have also suffered, as she has difficulty being present and often dissociates with friends and family.  She feels hopeless and powerless and has lost confidence.

128.     During her unpaid medical leave, Dr. Jespersen began taking antidepressant medication to address the symptoms of depression and anxiety she had developed as a result of the unsafe conditions, harassment, and discrimination to which she was subjected by Defendants.  Dr. Jespersen has also been under the care of two therapists since she began medical leave.  Her doctors have diagnosed Dr. Jespersen with post-traumatic stress disorder, which they attribute to the stress and trauma she has been forced to endure at CMF over the past three years.

129.     She is also experiencing physical repercussions that her physician suspects are due to the psychological distress she is experiencing because of the harassment and discrimination in her employment.  She was recently diagnosed with Temporomandibular Joint Disorder ("TMJ") due to muscle tension in her neck and jaw, and teeth grinding.  Dr. Jespersen also recently completed a sleep study and was diagnosed with sleep apnea.  Dr. Jespersen had never experienced these symptoms prior to being targeted and demoted.

130.     As a result of the discrimination and harassment, Dr. Jespersen has experienced emotional and physical distress including, but not limited to, anxiety, depression, sleep disturbance, weight gain, and teeth grinding.  Dr. Jespersen's passion for life and her profession lessened daily, as she sat in a desk job unable to see patients or provide the mental health care that she is licensed and trained to provide.  With this action, Dr. Jespersen is seeking to right the many wrongs inflicted upon her by CDCR.

## V.     CAUSES OF ACTION

### COUNT I
**Violation of FEHA, Hostile Work Environment**
**Cal. Govt. Code Section 12940 *et seq.***
**(Against CDCR)**

131.     Dr. Jespersen re-alleges and incorporates each, and every allegation contained in this Complaint.

132.     Throughout Dr. Jespersen's employment, CDCR employees and prisoners, aided by CDCR employees, subjected her to frequent unwelcome comments, conduct, and actions that were severe or pervasive because of her gender, including her nonconformity with gender stereotypes, her sexual orientation, and because of her advocacy on behalf of and association with gender nonconforming, gay, and transgender prisoners.  Such comments, conduct and actions have included, but are not limited to disparaging remarks, endangering her safety, and threats of violence.

133.     A reasonable employee in Dr. Jespersen's circumstances would have considered the work environment to be hostile or abusive, and Dr. Jespersen perceived her work environment to be hostile and abusive.

134.     The hostile work environment at CDCR altered the terms and conditions of Dr. Jespersen's employment and had the purpose or effect of unreasonably interfering with her ability to perform her work

duties.

135.   CDCR's conduct has been deliberate, willful, oppressive, malicious, fraudulent, and conducted in callous disregard of Dr. Jespersen's rights.   The hostile work environment was created, approved, and ratified by officers and managing agents of CDCR.

136.   By reason of the continuous nature of CDCR's discriminatory conduct, which persists to date, Dr. Jespersen is entitled to application of the continuing violations doctrine to all violations alleged herein.

137.   CDCR's actions and failures to act have caused Dr. Jespersen to suffer harm, including without limitation lost earnings, lost benefits, lost future employment opportunities, and other financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

138.    Because of CDCR's conduct, Dr. Jespersen is entitled to all legal and equitable remedies available for violations of the FEHA.

<u>**COUNT II**</u>
**Violation of FEHA, Retaliation**
**Cal. Govt. Code Section 12940(h)**
**(Against CDCR)**

139.   Dr. Jespersen re-alleges and incorporates each, and every allegation contained in this Complaint.

140.   Dr. Jespersen engaged in protected activity under the FEHA that included, but is not limited to, complaining internally and externally about the discrimination and harassment she experienced at CDCR because of her gender, including her nonconformity with gender stereotypes, her sexual orientation, and because of her advocacy on behalf of and association with gender nonconforming, gay, and transgender prisoners.

141.   As detailed above, Dr. Jespersen complained directly to Associate Warden Steve Pryor, Chief of Mental Health David Silbaugh, Chief of Psychiatry Joan Gerbasi, Supervisor Joe Dintino, EEO Coordinator Brian Olson, Captain Thomas Huntley, and several Watch Commanders.   She also complained through administrative complaints.

142.   CDCR retaliated against Dr. Jespersen for complaining about harassment and discrimination.   CDCR's retaliatory acts include, but are not limited to, isolating Dr. Jespersen and

constructively demoting her to an administrative role where she could no longer treat patients, nor file complaints on their behalf; allowing Defendant McDaniel to follow Dr. Jespersen to new assignments in an effort to intimidate her; and failing to separate Defendant McDaniel from Dr. Jespersen.  These adverse employment actions materially and adversely changed Dr. Jespersen's overall terms and conditions of employment.

143.   A reasonable employee would find CDCR's retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

144.   CDCR's retaliatory acts against Dr. Jespersen were a direct and proximate result of her protected activities.

145.   CDCR's conduct has been deliberate, willful, oppressive, malicious, fraudulent, and conducted in callous disregard of Dr. Jespersen's rights.   The retaliatory adverse employment action decisions were made, approved, and ratified by officers and managing agents of CDCR.

146.   By reason of the continuous nature of CDCR's discrimination and retaliatory conduct, which persists to date, Dr. Jespersen is entitled to application of the continuing violations doctrine to all violations alleged herein.

147.   CDCR's actions and failures to act have caused Dr. Jespersen to suffer harm, including without limitation lost earnings, lost benefits, lost future employment opportunities, and other financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

148.    Because of CDCR's conduct, Dr. Jespersen is entitled to all legal and equitable remedies available for violations of the FEHA.

**COUNT III**
**Violation of CFRA, Interference**
**Cal. Govt. Code Section 12945.1 *et seq.***
**(Against CDCR)**

149.   Dr. Jespersen re-alleges and incorporates each and every allegation contained in this Complaint.

150.   Dr. Jespersen was eligible for medical leave under the CFRA.

151.   Dr. Jespersen requested and took leave for her own serious health condition that made her temporarily unable to perform the functions of her job with CDCR.

152.    Dr. Jespersen provided reasonable notice to CDCR of her need for medical leave, including its expected timing and length.

153.    CDCR refused to return Dr. Jespersen to the same or a comparable job when her medical leave ended.  Indeed, CDCR pressured Dr. Jespersen to return from medical leave prematurely.

154.    Dr. Jespersen's taking of protected leave was a negative factor in CDCR's decision to constructively demote her.

155.    As a result of CDCR's conduct alleged in this complaint, Dr. Jespersen has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, lost future employment opportunities, other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

156.    CDCR's conduct has been deliberate, willful, oppressive, malicious, fraudulent, and conducted in callous disregard of Dr. Jespersen's rights.  The decision to refuse to return Dr. Jespersen to her position was made, approved, and ratified by officers and managing agents of CDCR.

157.    By reason of the continuous nature of CDCR's discriminatory and retaliatory conduct, which persists to date, Dr. Jespersen is entitled to application of the continuing violations doctrine to all violations alleged herein.

158.    Because of CDCR's conduct, Dr. Jespersen is entitled to all legal and equitable remedies available for violations of the CFRA.

**<u>COUNT IV</u>**
**Violation of CRFA, Retaliation**
**California Family Rights Act, Cal. Govt. Code Section 12945.2**
**(Against CDCR)**

159.    Dr. Jespersen re-alleges and incorporates each and every allegation contained in this Complaint.

160.    Dr. Jespersen was eligible for medical leave under the CFRA.

161.    Dr. Jespersen requested and took leave for her own serious health condition that made her temporarily unable to perform the functions of her job with CDCR.

162.    Dr. Jespersen provided reasonable notice to CDCR of her need for medical leave, including its expected timing and length.

AMENDED COMPLAINT                                                                                    29

163.   CDCR refused to return Dr. Jespersen to the same or a comparable job when her medical leave ended.  Indeed, CDCR pressured Dr. Jespersen to return from medical leave prematurely.

164.   Dr. Jespersen's taking of protected leave was a negative factor in CDCR's decision to constructively demote her.

165.   As a result of CDCR's conduct alleged in this complaint, Dr. Jespersen has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, lost future employment opportunities, other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

166.   CDCR's conduct has been deliberate, willful, oppressive, malicious, fraudulent, and conducted in callous disregard of Dr. Jespersen's rights.  The decision to refuse to return Dr. Jespersen to her position was made, approved, and ratified by officers and managing agents of CDCR.

167.   By reason of the continuous nature of CDCR's discriminatory and retaliatory conduct, which persists to date, Dr. Jespersen is entitled to application of the continuing violations doctrine to all violations alleged herein.

168.   Because of CDCR's conduct, Dr. Jespersen is entitled to all legal and equitable remedies available for violations of the CFRA.

## COUNT V
**Violation of California's General Whistleblower Statutes, Retaliation
Labor Code § 1102.5 *et seq*.
(Against CDCR)**

169.   Dr. Jespersen incorporates and restates each of the above paragraphs as if fully set forth herein.

170.   Pursuant to California's General Whistleblower Statutes, beginning with California Labor Code § 1102.5, it is illegal in the State of California to retaliate against any employee who provides information to a government or law enforcement agency where the employee has reasonable cause to believe that the information discloses a violation or noncompliance with a state or federal statute, rule, or regulation.

171.   Pursuant to Labor Code § 1104, CDCR is responsible for the acts of its managers, officers, agents, and employees for violations of Labor Code § 1102.5.

172.     Dr. Jespersen's reporting activities described in Sections IV.B, IV.C, and IV.E are incorporated herein by reference.

173.     In retaliation for Dr. Jespersen's protected disclosures, Defendants CDCR, Fox, Gerbasi, and McDaniel engaged in intentional acts of retaliation against Dr. Jespersen, including, but not limited to, isolating Dr. Jespersen and constructively demoting her to an administrative role where she could no longer treat patients, nor file complaints on their behalf; allowing Defendant McDaniel to follow Dr. Jespersen to new assignments in an effort to intimidate her; and failing to separate Defendant McDaniel from Dr. Jespersen.  These adverse employment actions materially and adversely changed Dr. Jespersen's overall terms and conditions of employment.

174.     Plaintiff's reporting activities were a contributing factor in the retaliatory actions taken against Plaintiff.

175.     An employer or any other person or entity that violates Labor Code § 1102.5 is guilty of a misdemeanor punishable, in the case of an individual, by imprisonment in the county jail not to exceed one year or a fine not to exceed one thousand dollars ($1,000) or both that fine and imprisonment, or, in the case of a corporation, by a fine not to exceed five thousand dollars ($5,000).

176.     Labor Code § 1102.5 further provides that "[n]othing in this chapter" shall prevent an employee's suit for damages.

177.     By reason of the continuous nature of CDCR's discriminatory and retaliatory conduct, which persists to date, Dr. Jespersen is entitled to application of the continuing violations doctrine to all violations alleged herein.

178.     CDCR's actions and failures to act have caused Dr. Jespersen to suffer harm, including, without limitation, lost earnings, lost benefits, lost future employment opportunities, and other financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

179.     Because of CDCR's conduct, Dr. Jespersen is entitled to all legal and equitable remedies available for violations of California Labor Code § 1102.5.

<u>COUNT VI</u>
**Violation of FEHA, Failure to Prevent Harassment, Discrimination, and Retaliation**
**Cal. Govt. Code Section 12940(k)**
**(Against CDCR)**

180.    Dr. Jespersen re-alleges and incorporates each and every allegation contained in this Complaint.

181.    During the course of her employment, Dr. Jespersen was subjected to harassment, discrimination, and retaliation by CDCR.

182.    Despite Dr. Jespersen's complaints about the harassment, discrimination, and retaliation she faced, CDCR failed to take all reasonable steps to prevent and remedy the conduct of Defendant McDaniel and others at CDCR.  To the contrary, CDCR empowered Defendant McDaniel and other employees to harass, discriminate against, and retaliate against Dr. Jespersen.

183.    CDCR's conduct has been deliberate, willful, oppressive, malicious, fraudulent, and conducted in callous disregard of Dr. Jespersen's rights.  The decisions to fail to prevent Defendant McDaniel's harassment were made, approved, and ratified by officers and managing agents of CDCR.

184.    By reason of the continuous nature of CDCR's discriminatory conduct, which persists to date, Dr. Jespersen is entitled to application of the continuing violations doctrine to all violations alleged herein.

185.    CDCR's actions and failures to act have caused Dr. Jespersen to suffer harm, including without limitation lost earnings, lost benefits, lost future employment opportunities, and other financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

**COUNT VII**
**Retaliation Against State Employee for Disclosure Protected**
**by the California Whistleblower Protection Act**
**Cal. Govt. Code Section 8547.8(c)**
**(Against Defendants CDCR, Fox, Gerbasi, and McDaniel)**

186.    Dr. Jespersen re-alleges and incorporates each and every allegation contained in this Complaint.

187.    Dr. Jespersen made repeated protected disclosures of improper governmental activity and other protected disclosures in good faith in her capacity as an employee with CDCR.  Dr. Jespersen's specific reporting activities described in Sections IV.B, IV.C, and IV.E are incorporated herein by reference.

188.    In retaliation for Dr. Jespersen's protected disclosures, Defendants CDCR, Fox, Gerbasi,

and McDaniel engaged in intentional acts of retaliation against Dr. Jespersen, including, but not limited to, isolating Dr. Jespersen and constructively demoting her to an administrative role where she could no longer treat patients, nor file complaints on their behalf; allowing Defendant McDaniel to follow Dr. Jespersen to new assignments in an effort to intimidate her; and failing to separate Defendant McDaniel from Dr. Jespersen.  These adverse employment actions materially and adversely changed Dr. Jespersen's overall terms and conditions of employment.

189.    Dr. Jespersen's disclosures of improper governmental activity were a contributing factor in the retaliatory actions Defendants CDCR, Fox, Gerbasi, and McDaniel took against Plaintiff.

190.    Dr. Jespersen filed a written complaint with the California State Personnel Board ("SPB"), alleging Defendants' retaliatory acts as described above, as required by California Government Code Section 8547.8(c).

191.    The SPB commenced an investigation of Dr. Jespersen's complaint.  The SPB issued findings pursuant to California Government Code Section 19683, sustaining Dr. Jespersen's Whistleblower Retaliation Complaint as to Defendants CDCR.

192.    As a proximate result of defendants' retaliatory acts, as described above, Dr. Jespersen has suffered harm, including, without limitation, lost earnings, lost benefits, lost future employment opportunities, and other financial losses.

193.    As a further proximate result of defendants' retaliatory acts, Dr. Jespersen has suffered humiliation, embarrassment, emotional and physical distress, and mental anguish.

194.    By reason of the continuous nature of Defendants' discriminatory and retaliatory conduct, which persists to date, Dr. Jespersen is entitled to application of the continuing violations doctrine to all violations alleged herein.

195.    Defendants' retaliatory acts, as described above, were done maliciously and willfully and were intended to cause injury to Dr. Jespersen.  Dr. Jespersen therefore requests an award of punitive damages in an amount appropriate to punish defendants for their misconduct and to deter others from engaging in similar misconduct.

## **PRAYER FOR RELIEF**

Wherefore, Dr. Jespersen requests the following relief:

a.      Acceptance of jurisdiction of this case;

b.      A declaratory judgment that the practices complained of herein are unlawful and infringed on Dr. Jespersen's rights secured under California law, including California Government Code § 12940, *et seq.*; California Government Code Sections 12945.1 and 12945.2, *et seq.*; the California Labor Code § 1102.5, *et seq.*; and the California Whistleblower Protection Act, Cal. Govt. Code Section 8547, *et seq.*

c.      A permanent injunction against Defendants, including CDCR and its partners, officers, owners, agents, successors, employees, representatives and any and all persons acting in concert with them, from engaging in any further unlawful practices, policies, customs and usages set forth herein;

d.      An Order requiring Defendants to initiate and implement programs that (i) remedy the hostile work environment at CDCR; (ii) ensure prompt, remedial action regarding all claims of harassment; and (iii) eliminate the continuing effects of the discrimination and retaliatory practices described herein;

e.      An Order restoring Plaintiff to her rightful position at CDCR, or in lieu of reinstatement, an order for front pay benefits;

f.      Nominal damages;

g.      Back pay, front pay, lost benefits, liquidated damages, and other damages for lost compensation and job benefits suffered by Plaintiff in accordance with proof presented at trial;

h.      Compensatory damages in an amount in accordance with proof presented at trial;

i.      Exemplary and punitive damages (where available) in an amount sufficient to deter future conduct;

j.      An award of litigation costs and expenses, including reasonable attorneys' fees to Dr. Jespersen;

k.      Pre-judgment and post-judgment interest; and

l.      Such other and further relief as the Court may deem just and proper.

Dated: February 9, 2018                    Respectfully Submitted,


                                           _/s/ Felicia Medina_
                                           Felicia Medina

                                           Felicia Medina
                                           Jennifer Orthwein
                                           Kevin Love Hubbard
                                           MEDINA ORTHWEIN LLP

                                           *Attorneys for Plaintiff Lori Jespersen*